GENERAL ELECTRIC CO. v. GARRETT COAL CO.

(Circuit Court of Appeals, Third Circuit. June 11, 1906.)

No. 12.

PATENTS—INFRINGEMENT—ELECTRIC CONTROLLERS.

The Knight & Potter patents, Nos. 587,441 and 587,442, the first for an apparatus and the second for a method for regulating the power and speed of mechanism driven by two electric motors, such as trolley cars, were not anticipated, and cover broadly the changing of the connection between the two motors from series to multiple and the reverse, the former by shunting one while protecting the other by a resistance, breaking the circuit connection of the shunted motor, and finally reconnecting the two in multiple with the resistance cut out; and in such process of change the time of cutting out the resistance, or whether all at once or gradually, are nonessential to the invention. As so constructed, *held* infringed.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

For opinion below, see 141 Fed. 994.

L. F. H. Betts and Charles Neave, for appellant.

Glenn S. Noble, for appellee.

Before DALLAS and GRAY, Circuit Judges, and CROSS, District Judge.

GRAY, Circuit Judge. This cause comes before the court on an appeal from a final decree of the Circuit Court for the Western District of Pennsylvania, dismissing the bill of complaint therein.

The bill of complaint in the court below alleged that the complainant-appellant was a corporation existing under the laws of the state of New York, and, claiming as assignee the rights secured by letters patent No. 587,441 and No. 587,442, issued to William B. Potter and W. H. Knight, the first for an apparatus and the second for a method for the control of electric motors, charged that the defendant-appellee, a corporation of the state of Pennsylvania, had infringed the same, and prayed for an injunction and the usual accounting. The usual defenses of lack of invention, anticipation and noninfringement, were set up in the answer. After proofs and a hearing, the court below filed an opinion, ordering the bill of complaint to be dismissed, on the ground that the defendant had not infringed any of the claims of the two patents in suit. The claims alleged to be infringed were claims 1 and 2 of patent No. 587,441 and claims 3, 4 and 9 of patent No. 587,442.

The patents in suit are for certain new and useful improvements in regulating apparatus for electrically driven mechanism, and in methods of regulating electrically driven mechanism, respectively. The two patents are so related, that they may be considered together, as the method of the second patent, without being merely the function of the mechanism described in the apparatus patent, is necessarily disclosed therein. The gist of the invention is set forth in the apparatus patent, No. 587,441, which exhibits a mechanism by which the broad claims of the method patent, No. 587,442, can be carried out. The inventions of the patent in suit relate to motors arranged in "series" and

in "parallel," for electrically driven vehicles, notably trolley cars, and to means and methods of controlling the same. As the methods described in the second patent, No. 587,442, is fundamental to both patents, we quote the description thereof from its specifications:

"Our invention relates to the method of regulating the power and speed of mechanism driven by two electric motors by placing them in series for low speed and in multiple for a higher speed. Heretofore this method, although understood to be one capable of affording greater economy than the usual method of regulating by means of artificial resistance, has not come into general use by reason principally of the difficulty encountered in making the change of motor connections from series to multiple. This difficulty has been due not only to the destructive arc produced on the rupture of such current-bearing circuits as it might be necessary to break in making the change in circuit connections, but also to the wide variation in motor resistance—both ohmic and inductive—between the series and the multiple arrangements, which resistance variation produced correspondingly violent speed variation in the driven mechanism. Our invention is designed to overcome these objections to this desirable method of regulation and has demonstrated its capacity for accomplishing this result in a thoroughly practicable manner. It consists in a method of control'ing the speed and power of mechanism driven by two electric motors by gradually or progressively effecting the change of motors from series to multiple by first shunting one of them, so as to leave in circuit the other one only, which continues in an active condition and is connected directly to the main circuit, as in the multiple arrangement, but is protected against the effect of the full voltage of the main circuit by an auxiliary or supplementary resistance, such as an artificial resistance of wire or any other suitable material, which is inserted in the circuit at the time of the aforesaid shunting and is maintained in circuit a sufficient length of time to bring the unshunted motor to its multiple rate of speed under the increased voltage at its terminals. The other motor, after being shunted, is disconnected from the circuit, so that for a brief period no current passes through it. It is then connected in multiple with its mate and the auxiliary resistance withdrawn. Our invention includes also the contrary method of changing from multiple to series by performing the aforesaid series of acts in a reverse order. We have, moreover, designed certain mechanism that may be conveniently used in practicing the aforesaid method, and we have disclosed the same herein as an assistance to the ready understanding in all its details of our novel method; but we make no claim herein to such mechanism, as it is embraced by another application for patent bearing serial No. 433,906, filed May 21, 1892."

In the view we take of the questions in controversy, we need only give attention to the diagrammatic explanation of the method of the patent, without concerning ourselves with the specifications that relate to a mechanism for putting the method in practice.

The advantages to result in speed regulation, from combining the series and parallel systems of motors, were recognized in the prior art, but it is said in the specification above quoted, that the series-parallel system "had not come into general use by reason principally of the difficulty encountered in making the change of motor connections from series to multiple." A sudden breaking of the circuit, when the motors are in series, the current flowing through both without artificial resistance, would result in a disastrous sparking. The same result in less degree would occur when the speed was reduced by artificial resistance. Besides the sparking, the necessity of shutting off the current, and thus leaving the car with the slow speed of its mere momentum, in order to pass from series to multiple, and of encountering

the shock of the immediate acceleration of speed thus produced, was a difficulty to be overcome. This, it is claimed, was successfully accomplished by the method and apparatus of the patents in suit. The method is a gradual, or step by step, progress from the series to the parallel supply of the electric current to the motors, by which the current may be safely broken as to one motor in series, the same be at once changed to parallel relation to the other, and the multiple rate of speed attained, without shock and without sparking, there being, during the process, no shunting off of the current or reduction of speed. This method is diagrammatically set forth in the patent in suit, No. 587,442, as follows:

"Referring to the diagrams in Figs. 1 to 9, it will be observed in Fig 1, which represents the first condition of motor-circuits established by the switch, the two motors are out of action and there are two breaks in the circuit, one between the trolley T and resistance R and the other between the armature Aa of the motor A and the field-magnet Bf of the motor B. The first step in the series is to close the latter of these two breaks, when the two motors will be in series, as shown in Fig. 2, but still disconnected from the trolley. The second step is to close the remaining break, when the condition will be as shown in Fig. 3. This condition is the first one in which a complete circuit is made, and it gives the lowest rate of speed, the two motors being in series with each other and with a resistance. The third step is to short-circuit the resistance, when the condition shown in Fig. 4 is produced, giving a higher rate of speed, although it is to be understood that it is also of importance that the resistance be adapted to prevent the sudden influx of an undue volume of current at the moment the circuit is completed. The fourth step introduces the resistance once more into the circuit, as shown in Fig. 5, and the fifth completes a shunt-circuit around one of the motors—to wit, motor D—as appears in Fig. 6. With these two steps the process of gradually changing the motors from series to multiple begins. The shunting of one motor is a preparation for its entire removal from the series connection, and it acts at the same time to connect the unshunted motor directly to the main line circuit, which is the connection it has when in multiple; but the effect of this change is modified by the reintroduction of the resistance, which prevents an undue degree of acceleration in speed and protects the unshunted motor from injury by an undue volume of current. The sixth step, continuing the series-multiple change, produces the condition indicated in Fig. 7, in which the circuit of the shunted motor is severed, so that no current passes therein, while at the seventh step this motor is connected in multiple with its mate, which, it will be observed, has continued its active operation, the resistance at the same time being short-circuited. This completes the change of motor connections and the two motors which were formerly in series without resistance are now in multiple without resistance, as the resistance has performed its designed function of assisting in the changing-over process, which by its aid has been accomplished gradually and safely. The eighth and last step is one which we have provided for giving an extra rate of speed to the motors in multiple, and this is accomplished by shunting the field-magnets of the two motors through a suitable resistance, as is indicated in Fig. 9. The above described series of circuit combinations provides for several distinct rates of speed, between which the conditions may be regarded as more or less temporary and transitional. Thus the first rate of speed will be given by the condition in Fig. 3; the second by the condition in Fig. 4; the third by the condition in Fig. 6; the fourth by the condition in Fig 8, and the fifth by the condition in Fig. 9."

What is claimed as new and characteristic, and involving invention, in the method here described, is the shunting of one of the motors, while protecting the other by dead resistance in series with it, and then breaking the circuit of the shunted motor and arranging it in parallel with the first motor, and the cutting out of the dead resistance, so as to attain the maximum rate of multiple speed, the live resistance of the counter electro motive force of both rapidly revolving motors supplying the requisite resistance, without the waste of electric energy involved in the use of dead resistance. As the shunted motor is attached to the axle, it revolves at the same speed as the other motor, and its counter electro current is active and available at the instant of transition to the multiple arrangement. It is apparent that the sooner the dead resistance used to protect the shunted motor, is dispensed with, and its place supplied with the live resistance of the counter current generated by the rapidly revolving motors, the greater the economy of

the electric current. But whether the cutting out of the whole dead resistance be instantaneous on the change to the multiple arrangement, or by gradual steps thereafter, does not seem essential to the method as claimed. Retaining it at the moment of change, and its elimination by one or more steps afterwards, merely means intermediate rates of speed, before the maximum multiple speed is attained.

Claims 3, 4 and 9 of the method patent, and claims 1 and 2 of the apparatus patent, the ones here under consideration, are as follows:

"Patent 587,442.

"(3) The method of regulating a car or vehicle driven by a pair of electric motors, which consists in connecting the motors in series, shunting one motor while maintaining a circuit through the remaining motor and through a resistance protecting the same, opening the circuit of the shunted motor and connecting the two motors in multiple.

"(4) The method of regulating the power and speed of mechanism driven by a pair of series-wound electric motors receiving current from a constant potential circuit, which consists in first connecting the motors in series and in circuit with a resistance, then reducing the resistance until it is substantially cut out, then shunting one motor and again making use of the resistance to protect the unshunted motor, then disconnecting the shunted motor from circuit and finally reconnecting the motors in multiple."

"(9) The method of regulating the power and speed of mechanism driven by two electric motors, which consists in placing the two motors in series for slow speed and changing them from series to multiple for higher speed by first cutting one motor out of circuit, replacing it by a resistance in series with the other motor, and finally placing the two motors in multiple with the resistance cut out."

"Patent 587,441.

"(1) In an apparatus for regulating the power and speed of mechanism driven by two electric motors, the combination of two electric motors, and a switch connecting them in series with each other and with a resistance, the switch provided with contacts and connections arranged to shunt one motor, leaving the other in series with the resistance, to disconnect one motor and to connect the two motors in multiple, all by successive steps.

"(2) In an apparatus for regulating the power and speed of mechanism driven by two electric motors, the combination of two motors, and a switch for placing them in series with each other, and with a resistance, the switch provided with contacts and connections adapted to cut out the resistance for one rate of speed, to again cut in the resistance, to shunt one motor, to disconnect one motor and cut out the resistance, and to connect the two motors in multiple."

The learned judge of the court below has with admirable clearness stated the situation which the method of the patent in suit was designed to meet, as follows:

"It was fully recognized prior to these patents that a trolley car could best be operated by the use of two motors connected in series for slow and in multiple for high speed. If a single motor was used there was no way to control its power and speed except by putting more or less dead resistance in series with it to regulate the current to which it was subjected. But the use of such resistance is highly objectionable, for as stated by complainant's expert: 'Under such circumstances the counter electro-motive force of the motor at slow speeds would be small, while the dead resistance would be large and the impressed electro-motive force of the trolley wire would be wastefully consumed in heating the dead resistance and only to a small degree consumed usefully in overcoming the counter electro-motive force.' The practice, therefore, is to use two motors and supplement them by a minimum of dead resistance and by series or multiple connections secure two extremes

of speed under economic conditions. But the difficulty of changing from series to multiple relation with a second motor or vice versa lies in the electric arc produced by breaking the circuit or in the sudden rush of heavy current incident to the connecting of a slow moving motor, with its slight counter-electro-motive force, to a trolley wire with its great impressed electro-motive force."

We think the learned judge, however, has misconceived the essential feature of the method described, and in consequence has unduly restricted the scope of the invention, as claimed. He has, moreover, confined his discussion to claim 2 of the apparatus patent. We quote from the opinion, as follows (the italics being those of the court below):

"And the claim is: '(2) In an apparatus for regulating the power and speed of mechanism driven by two electrical motors, and a switch for placing them in series with each other and with a resistance, the switch provided with contacts and connections adapted to cut out the resistance, for one rate of speed, to again cut in the resistance, to shunt one motor, to disconnect one motor *and to cut out the resistance* and to connect the two motors in multiple.' It will thus be seen that in the transition stage 7 there is no dead resistance to counteract the current. In the reverse transition the break of the current would, owing to the absence of resistance, cause sparking which is alleged to be disastrous and is conceded to be objectionable, and the testimony would indicate the complainant later adopted a construction in type K which obviated this sparking in type J which embodied the apparatus of the patent."

We think that, even as to this claim, it is not a necessary inference, that the resistance is to be cut out before the connection of the two motors in multiple. As we have already said, the essential characteristic of the invention claimed, is, the shunting of one of the motors while protecting the other by resistance, and then breaking the circuit connection of the shunted motor and putting it in parallel with the other motor. The time of cutting out of the resistance after it has done its work, is not important. That the cutting out and the multiple connection was in this second claim spoken of as simultaneous, would seem a fair, if not a necessary, interpretation of the language. In that case, the protection of the resistance would be continued during the transition.

We agree with counsel for appellant, that however this may be, and even if we assume that claim 2 of the apparatus patent is a detailed claim, strictly limited to what is shown in the patent, there is no reason for reading the same limitation into the other claims. Claim 1 of the apparatus patent and claims 3, 4 and 9 of the method patent, set forth the characteristic features of the invention, as we have described it, either without reference to any cutting out of the resistance after it has been cut in for the protection of the active motor, when one of the motors has been shunted, or, as in claim 9 of the method patent, which speaks of "finally placing the two motors in multiple with the resistance cut out." It is clear that these claims do not require the cutting out of the resistance after its use for the protection of the unshunted motor, at any particular time, certainly not before the connection in multiple is effected. The cutting out of the whole resistance, whether simultaneously with the multiple connection or thereafter, is necessary to the attainment of the maximum rate of speed, but it is manifestly unimportant and nonessential as to what is characteristic of the invention,

whether the resistance be cut out all at once or gradually. The claims last referred to, evidently treat the time of cutting out the protecting resistance as unimportant and irrelevant to the invention, leaving it as a matter to be determined by judgment and experience. On the view taken by the court below in this regard, hinged its judgment as to the fact of infringement by defendant.

The subjoined diagram, illustrating the method of operation of the defendant's controller, shows that the only difference between it and the method of the patent in suit, as illustrated in the diagram of the patent, is that the resistance, after being cut in to protect the motors in series, when the current is first applied, is gradually taken out by an intermediate step, instead of being all at once cut out, so as to produce the situation in figure 4 of both diagrams, where the highest rate of speed with the motors in series is attained.

GENERAL ELECTRIC Co. vs. GARRETT COAL Co.
COMPLAINANT'S EXHIBIT DIAGRAM of DEFENDANT'S CONTROLLER
WITH RESISTANCE LOCATED IN THE CIRCUIT OUTSIDE
OF THE TWO MOTORS."

The same gradual elimination of the resistance is shown after the breaking of the current through the shunted motor, until the highest rate of speed in multiple is attained, as in figure 9 of defendant's diagram and figure 8 of the patent in suit. It is true, that the defendant, by this gradual elimination of resistance obtains several rates of

speed, both in series and in multiple arrangement, but the manner of the elimination of resistance, whether in series or in multiple, seems to us plainly not of the essence of the invention, as described in the patent, or set forth in the claims to which we have referred. These additional steps in the elimination of resistance, shown by the defendant, are speed steps, and not the steps of the gradual process of change from series to parallel arrangement, shown and claimed as the essential feature of the patents in suit. That the defendant cut out the resistance used to protect the shunted motor, gradually, thereby securing one or more grades of speed in multiple before the highest, when the resistance was all eliminated, is doubtless an advantageous and convenient way of using the method of the patent in suit, and complainant itself has adopted such a construction of its apparatus as will secure these intermediate rates of speed. But the essential features of the invention described and claimed in the patents in suit, are found, whether the elimination of the protecting resistance be accomplished all at once or gradually.

We think, therefore, the court below erred in not finding infringement of both patents in suit. The court below, in its opinion on the question of infringement, has assumed the validity of the patents, and has therefore not discussed the prior art as affecting it, or the scope of the patents in suit. It is not seriously contended that any of the patents referred to by the defendant anticipate the patents in suit. They are cited as illustrative of the prior art, and for the purpose of limiting the scope of complainant's patents. An examination of the principal patents referred to by counsel for complainant in his brief, together with the expert testimony in relation thereto, makes it plain that no useful purpose would be subserved by considering them in detail, or discussing them further than to say, that none of them, down to the Condict patent of November 20, 1898, discloses any method of changing from series to multiple, by shunting one of the motors, while protecting the other by resistance in series with it, and then breaking the circuit of the shunted motor and arranging it in parallel with the first motor. Their mode of accomplishing the change presents all the difficulties and troublesome features which the patents in suit have sought to avoid.

The Condict patent, the most meritorious of those referred to, was for a controller, by which motors in series and in parallel could be operated. This was done by a large use of dead resistance, which, to use the language of complainant's expert, "not only acted to moderate the starting of the motors, but also served to give intermediate gradations of speed additional to the two secured by the series and multiple arrangement respectively." The change of circuits from series to multiple was accomplished by bringing into play the large dead resistance at the moment when the change of circuits occurred. All the series circuits of the motors were opened, and the motors reconnected in multiple by a single step. Condict's method required a very large dead resistance and wasteful loss of energy. By the entire and instantaneous cutting off of the current in series, and the turning of the same into multiple arrangement, a sudden and objectionable retardation and acceleration of speed were effected, and sparking was not avoided. They

are, however, all avoided by the simple method of shunting one motor and protecting the other by resistance, before the break in the circuit is made, and then connecting the shunted motor in multiple with the active and protected motor. And this is the method of the patent in suit.

For the reasons stated, we think the decree of the court below should be reversed, and the record remanded, with directions to enter a decree in conformity with this opinion.