GENERAL ELECTRIC CO. v. MORGAN–GARDNER ELECTRIC CO.

(Circuit Court of Appeals, Seventh Circuit. October 6, 1908. Rehearing Denied November 24, 1908.)

No. 1,462.

1. JUDGMENT (§ 675*) — CONCLUSIVENESS OF ADJUDICATION—PERSONS PARTICIPATING IN DEFENSE.

The fact that a manufacturing company paid the attorney who defended a suit against a customer for infringement of a patent, and part or

all of the costs, did not make it a party, so as to be concluded by the decree, where it did not appear that the attorney was not under the exclusive direction and control of the defendant.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1191; Dec. Dig. § 675.*]

**2. PATENTS (§ 102\*) — APPLICATIONS AND PROCEEDINGS THEREON—AMENDMENT OF APPLICATION.**

An applicant for a patent may properly file new claims in the Patent Office without verification, where they are within the invention as disclosed in the specification and drawings, and narrower than the original claims.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 102.*]

Amendment of application, see note to Cleveland Foundry Co. v. Detroit Vapor Stove Co., 68 C. C. A. 239.]

**3. PATENTS (§ 328\*)—VALIDITY AND INFRINGEMENT—ELECTRICAL CONTROLLERS.**

The Knight and Potter patents, Nos. 587,441 and 587,442, for a means and method of regulating the power and speed of mechanism driven by two electric motors, *held* valid and infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

For opinion below, see 159 Fed. 951.

Appellant failed in its suit to enjoin alleged infringement of claims 1 and 2 of patent No. 587,441 and claims 3, 4, and 9 of patent No. 587,442, both issued on August 3, 1897, to Knight and Potter, one for a "regulating apparatus for electrically driven mechanism," and the other for a "method of regulating electrically driven mechanism." 159 Fed. 951.

The claims are as follows:

"1. In an apparatus for regulating the power and speed of mechanism driven by two electric motors, the combination of two electric motors and a switch connecting them in series with each other and with a resistance, the switch provided with contacts and connections arranged to shunt one motor, leaving the other in series with a resistance, to disconnect one motor, and to connect the two motors in multiple, all by successive steps."

"2. In an apparatus for regulating the power and speed of mechanism driven by two electric motors, the combination of two motors and a switch for placing them in series with each other and with a resistance, the switch provided with contacts and connections adapted to cut out the resistance for one rate of speed, to again cut in the resistance, to shunt one motor, to disconnect one motor and cut out the resistance, and to connect the two motors in multiple."

"3. The method of regulating a car or vehicle driven by a pair of electric motors, which consists in connecting the motors in series, shunting one motor while maintaining a circuit through the remaining motor and through a resistance protecting the same, opening the circuit of the shunted motor and connecting the two motors in multiple."

"4. The method of regulating the power and speed of mechanism driven by a pair of series-wound electric motors receiving current from a constant potential circuit, which consists in first connecting the motors in series and in circuit with a resistance, then reducing the resistance until it is substantially cut out, then shunting one motor and again making use of the resistance to protect the unshunted motor, then disconnecting the shunted motor from circuit, and finally reconnecting the motors in multiple."

"9. The method of regulating the power and speed of mechanism driven by two electric motors, which consists in placing the two motors in series for slow speed, and changing them from series to multiple for higher speed by first cutting one motor out of circuit, replacing it by a resistance in series with the other motor, and finally placing the two motors in multiple with the resistance cut out."

Parts of the original application for patent No. 587,442, as shown by the file wrapper and contents, are as follows:

"This method, known as the 'series-multiple' method of regulation, with its inherent advantages, has been proposed heretofore, and its characteristics have been perfectly understood theoretically; but to our knowledge no one has succeeded in carrying it into practice in a satisfactory manner. The principal difficulty in the way of making a satisfactory application of this method appears to have been that it is impossible to make the change of connection from series to multiple and vice versa while the current was still passing through the motors without forming such arcs at the contact points as would speedily disintegrate them and render the apparatus unreliable and subject to rapid depreciation. For overcoming this difficulty a number of plans have been suggested. For instance, it has been proposed that at the moment of making the change the circuit should be interrupted either entirely or by the interposition of a considerable resistance, so that there should be no current passing while the change was being made, and, in consequence, no arcs at the contact points.

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast; · &ast;    &ast;

"This method [the method of the patent] in general consists in regulating the power and speed of mechanism driven by two electric motors by placing the two motors in series for slow speed and changing them to multiple connection for higher speed by first short-circuiting one motor while its field magnet is still energized, and then disconnecting one terminal of such motor and reconnecting it to the corresponding terminal of the other motor, whereby the two motors may be in multiple with each other. We accomplish this without the use of external means, such as a circuit breaker or resistance to interrupt or substantially reduce the current while the change is being made.

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;    ,    &ast;    &ast;    &ast;    &ast;

"Referring to Figs. 1 to 9, it will appear that in the first position, with the motors out of action, there would be two breaks in the circuit, one between the trolley T, and resistance R, and the other between the armatures, Aa, of the motor A, and the field, Bf, of the motor B. In the second step, Fig. 2, the latter break will be closed, there remaining only the break between the trolley and resistance. In the second step the two combinations shown in Figs. 2 and 3 will be produced, the two breaks in the circuit being closed in succession, and the motors being left in series with each other and the resistance. In the third step the resistance is short-circuited and the motors are in series, as shown in Fig. 4. At the fourth step the two combinations shown in Figs. 5 and 6 are produced. At the fifth step the combinations shown in Figs. 7 and 8 are produced; and, lastly, at the sixth step the combination shown in Fig. 9 is effected

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

"These different figures show the combinations made at each step in the regulation. Thus, referring again to the figures, in Fig. 18 the circuit is open at two points; in Fig. 19 the circuit is open between 1 and 2, and closed between 9 and 10; in Fig. 20 the circuit is as follows: From trolley T, to plates 1 and 2, to resistance R, to field Af, to armature Aa, to blow-out magnet, to plates 9 and 10, to field Bf, to armature Ba, to ground G, giving the combination indicated in Fig. 3. In Fig. 21 the circuit is from the trolley T, to plates 1 and 2, to plates 4 and 3, to field Af, to armature Aa, to blow-out magnet, to plates 9 and 10, to field Bf, to armature Ba, to ground G, giving the combination indicated in Fig. 4. In Fig. 22 the circuit is from the trolley T, to plates 1 and 2, to resistance R, to the field Af. to the armature Aa, to blow-out magnet, to plates 5 and 6, to field Bf, to armature Ba, to ground G, giving the combination shown in Fig. 6 with the motor, A, short-circuited by a connection through plates 9 and 10 to ground G. In Fig. 23 the circuit is from the trolley T, to plates 1 and 2, to plates 4 and 3, to field Af, to armature Aa, to blow-out magnet, to plates 5 and 6, to ground G, giving the combination shown in Fig. 7. In Fig. 24 the circuit is from trolley T, to plates 1 and 2, where it divides, one branch going by plates 4 and 3 to field Af, to armature Aa, to blow-out magnet, to plates 5 and 6, to ground G, while the other branch goes by plates 8 and 7 to field Bf, to armature Ba, and to ground G, giving the combination shown in Fig. 8. In Fig. 25 the circuit is from trolley T, to plates 1 and 2,

then dividing and one branch going by plates 4 and 3 to field Af. to armature Aa, to blow-out magnet, to plates 5 and 6, to ground G, with a subbranch going from plate 4 to plates 8 and 7, to plates 11 and 12, to armature Aa, and thence to ground as before, establishing thus a shunt around the field magnet Af, containing resistance Y. The other branch goes from plate 4 to plates 8 and 7, to field Bf, to armature Ba, and to ground at G, with a subbranch from plate 7 to plates 11 and 13, and by a resistance Y to armature Ba, to ground G, thus shunting the field Bf. This gives the last combination indicated in Fig. 9.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"It will thus be seen that in the various combinations that we have brought about by the successive connections established by the switch, we have first placed the motors in series for slow speed as in Fig. 4, and then short-circuited one motor as in Fig. 6, then disconnected the inner terminal of the short-circuited motor as shown in Fig. 7, and finally reconnected the said terminal to the corresponding terminal of the other motor, as in Fig. 8, so that the two have gradually been shifted from series to multiple connection. In addition we have modified the action of the two motors while in their respective connections by means of resistance R, when they were in series, and by shunting their field magnets when in multiple and thereby secured additional rates of speed. By this plan we only use a resistance when the current is at a minimum, the motors being in series, but when a greater amount of current is required by the motors in multiple, we do not use a resistance, but rely upon a change in their field magnet strength to attain the last degree of regulation thereby avoiding loss in resistance. It must also be noted that the combinations shown in Figs. 5 and 6 are effected almost simultaneously, the object of reinstating the resistance being to have to take the place for a short period of the short-circuited motor, and preserve the other motor from being injured by a sudden excess of current, and it is not intended and does not in effect act to cause a material decrease of the current, so that the change of connections shall take place while the circuit is substantially opened.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"1. The method of regulating the power and speed of mechanism driven by two electric motors, which consists in placing the two motors in series for slow speed, and changing them in multiple connection for higher speed by first short-circuiting one motor while its field magnet is still energized, and then disconnecting one terminal of that motor and connecting it to the corresponding terminal of the other motor.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"10. The method of regulating the power and speed of mechanism driven by two electric motors which consists in placing the motors in series connection and then changing them to multiple connection while their field magnets are still energized and without interrupting or reducing the current by external means."

L. F. H. Betts, for appellant.
Glenn S. Noble, for appellee.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). In General Electric Co. v. Garrett Coal Co., 146 Fed. 66, 76 C. C. A. 528, the claims here in suit were held valid and infringed by the device used by the Garrett Coal Company and manufactured by appellee. Some additional prior patents, without explanation or discussion by experts, have been put into the present record. Our examination of them leads us to conclude that the best possible exhibition of the prior art was made in the Garrett Coal Company record, which constitutes the substantial part of the record in this case. On the issues of patentable novelty and infringement, we deem it unnecessary to do more than

express our concurrence in the views of the Circuit Court of Appeals for the Third Circuit.

In a supplemental bill herein, filed after the final decree was entered in the Garrett Coal Co. Case, appellant alleged that appellee "defended that suit on behalf of the Garrett Coal Company, paid the expenses thereof, and was in fact the real defendant therein; the Garrett Coal Company being simply the nominal defendant." Appellee denied the charge. While the proofs show that appellee paid an attorney who appeared for the Garrett Coal Company and defended the suit, and that, at the conclusion of the litigation, appellee paid a part or possibly all of the court costs, there is no proof that the attorney was not under the exclusive direction and control of the Garrett Coal Company, or that appellee had any standing except as an interested and sympathetic nonparticipant.

The question that has been most strenuously contested here has to do with the scope of the original application. The invention, so far as it is covered by the claims in suit, consists in the means and method of changing from series to multiple by shunting one of the motors, while protecting the other by resistance in series with it, and then breaking the circuit of the shunted motor and arranging it in parallel with the other. The claims in suit were not filed with the original application. They were submitted later by the applicants through their attorney. As these claims were not supported by a new verification, appellee insists that the Patent Office had no warrant in law to allow them, because "the invention claimed is substantially different from any indicated, suggested, or described in the original application." The applications were substantially alike. Excerpts, quoted in the statement, include the portions of the application for the method patent on which the respective arguments of the parties are based. The drawings in the original applications (copied in 146 Fed., at page 68, and in 76 C. C. A., at page 530) indicate that, in changing from series to multiple, when one motor is shunted, the other is protected by resistance in series with it. In describing the step by step changes the applicants said: "At the fourth step the two combinations shown in Figs. 5 and 6 are produced." And these figures point to the characteristic feature of the claims in suit. Referring to the circuits at different stages, applicants make it clear that in Fig. 22 one motor is shunted and the other is protected from the full current by means of an external resistance. In the concluding paragraph they said:

"The object of reinstating the resistance" (during the steps shown in Figs. 5 and 6) is to have the resistance "take the place for a short period of the short-circuited (shunted) motor and preserve the other motor from being injured by a sudden excess of current."

Against these statements, relied on by appellant, appellee lays stress on the applicants' declaration,

"We accomplish this (change from series to multiple by our step by step method) without the use of external means such as a circuit breaker or resistance to interrupt or substantially reduce the current while the change is being made."

In the face of the disclosures in the drawings, in the specific account of the successive steps to be taken, in the detailed description of the course of the circuits, and in the stated reason for using resistance

while shunting the one motor, appellee insists that in the above quotation the applicants asserted that they accomplished their new result without the use of resistance. If a period is to be placed after "resistance," appellee could as well claim that the applicants expressly disclaimed the use of a "circuit breaker." To us it seems that the applicants, instead of stultifying themselves by saying at one place that they did not use resistance and in another that they did and why they did, were broadly distinguishing their method from those of the prior art. One of the earlier methods was to employ enough resistance "so that there should be no current passing while the change was being made." Applicants said in effect that in their method they do not employ resistance in order to interrupt or reduce the current while the change is being made, but do employ it only for the purpose of protecting the unshunted motor. The original claims, as appellee points out, did not call for the use of resistance, and original claim 10 covered the change from series to multiple "without interrupting or reducing the current by external means." Original claims 1 and 10 indicate to us that the applicants believed themselves entitled broadly to a monopoly of the method of changing from series to multiple by shunting one of the motors, then breaking the circuit of the shunted motor, and then arranging it in parallel with the other motor, irrespective of whether the unshunted motor was protected by external resistance or not; and, since the drawings and specification pointed out clearly the desirability of external resistance for the unshunted motor while the change was being made, we think it was competent for the applicants through their attorney to file the narrower claims in suit without an accompanying affidavit. Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586.

Appellee refers to a record of an interference between the applicants and one Lamme. The issue was with respect to the subject-matter of the applicants' original claim 1. Appellee cites the testimony given by the applicants in that proceeding as indicating that the use of resistance in protecting the unshunted motor was no part of their invention. Original claim 1 by its terms was not restricted to the use of external resistance for the protection of the unshunted motor while the other was in shunt. The testimony was directed to the issue. The applicants did not testify (and we are not referred to any question that was propounded to them on the subject) that their verified original application was untrue. Passing the question of competency, we find nothing in their testimony that conflicts with our construction of their application

The decree is reversed, with the direction to enter a decree in appellant's favor for an injunction and an accounting.